WILLIAM RALPH CLIFT, *et al.*,                                      Plaintiffs,

v.

RDP COMPANY, *et al.*,                                               Defendants,

\* \* \*

RDP COMPANY,                                              Counterclaimant,

v.

WILLIAM RALPH CLIFT, *et al.*,                  Counterclaim Defendants,

\* \* \*

RDP COMPANY,                                                 Crossclaimant,

v.

LAFARGE WEST, INC.,                                Crossclaim Defendant,

\* \* \*

LAFARGE WEST, INC.,                                          Crossclaimant,

v.

RDP COMPANY,                                          Crossclaim Defendant

\* \* \*

RDP COMPANY,                                           Third-Party Plaintiff,

v.

MARTIN MARIETTA MATERIALS, INC.,              Third-Party Defendant.

1

# MEMORANDUM OPINION

The Clift family filed this action against RDP Company and Lafarge West, Inc., alleging various claims arising out of, or connected to, a mineral rights lease dating back to 1977.  With discovery at an end, the Clifts, RDP Company, and Lafarge West filed competing motions for summary judgment.  (To the extent RDP Company prevails, Martin Marietta Materials, Inc., whom RDP Company impleaded, seeks summary judgment too.)  For reasons discussed at length below, the Clifts' Motion for Summary Judgment, R. 84, is **DENIED**, and RDP Company's Motion for Summary Judgment, R. 83, Martin Marietta Materials, Inc.'s Motion for Summary Judgment, R. 85, and Lafarge West, Inc.'s Motion for Summary Judgment, R. 86, are **GRANTED**.

## I.

### A.

#### 1.

Between 1967 and 1977, Clifton, Sr. and Margaret Clift executed three leases granting Fredonia Valley Quarries, Inc. the right to quarry "all merchantable limestone rock and other kindred substances in, under and upon" a seventy-two acre tract of land in Caldwell County, Kentucky.  R. 84-2 at 1 (1967 Lease); R. 84-3 at 1 (1972 Lease); R. 84-4 at 1 (1977 Lease).

*The 1967 Lease.*  Clifton, Sr. and Margaret signed the first lease on August 9, 1967.  *See* R. 84-2 at 4.  In detail, the lease granted to Fredonia Valley Quarries

> the right and license to enter upon the premises hereinbefore described at all times and to use so much of the surface thereof as may be reasonably necessary in searching for and [exploring] for limestone rock and other kindred substances and in determining the thickness thereof, and for the establishment of Quarries and Quarry buildings and for the deposit of waste material from such Quarries; also the right and license to quarry and remove said limestone and/or kindred substances from said premises

together with the rights, privileges, license and easements necessary, incidental or in any manner appertaining to the proper prosecution of the business of quarrying and removing said limestone and other kindred substances; also the right to occupy so much of the surface of said premises as may be reasonably necessary for storing of said limestone rock or other kindred substances, and depositing the refuse therefrom, and the right to erect on said premises such buildings, structures and fixtures as may be necessary or incidental to the proper prosecution of said business of quarrying.

*Id.* at 1–2. The lease reserved to the Clifts the "right to remove all timber . . . from [the] premises thirty days before quarry operations" commenced. *Id.* at 2.

In exchange, the lease guaranteed the Clifts a minimum payment of $50.00 per month without regard to whether Fredonia Valley Quarries quarried the Clifts' tract. *Id.* Once Fredonia Valley Quarries began excavating the Clifts' land, though, it guaranteed a minimum royalty of $500.00 for each acre mined or stripped, or on which it disposed of waste, to be paid from a production royalty. *Id.* at 3. The production royalty consisted of 5¢ per ton for the first 2,000 tons of limestone, and of 3¢ for each ton thereafter, removed during any particular month, less the guaranteed minimum payment of $50.00. *Id.* at 2.

The initial term of the lease was for five years with an option to renew in perpetuity if Fredonia Valley Quarries "well and truly kept and performed . . . all the stipulations, covenants and agreements" in the lease. *Id.* at 3. Fredonia Valley Quarries reserved the right to terminate the lease "at the end of any month upon written notice to the [Clifts] and the payment of $250.00." *Id.* If Fredonia Valley Quarries failed to pay "rent for a period of six months beyond [the] due date," the Clifts retained the right to declare "a forfeiture of [the] lease." *Id.*

*The 1972 Lease.*  A little over five years later, on August 16, 1972, Clifton, Sr. and Margaret executed a second lease identical in all respects to the lease signed in 1967.  *Compare* R. 84-3 at 1–4, *with* R. 84-2 at 1–4.

*The 1977 Lease.*  Clifton, Sr. and Margaret executed the third and operative lease with Fredonia Valley Quarries on August 1, 1977.  *See* R. 84-4 at 4.  The third lease granted to Fredonia Valley Quarries

> the right and license to enter upon the premises hereinbefore described at all times and to use so much of the surface thereof as may be reasonably necessary in searching for and exploring for limestone rock and other kindred substances and in determining the thickness thereof, and for the establishment of Quarries and Quarry building and for the deposit of waste material from such quarries; also the right and license to quarry and removed said limestone and/or kindred substances from said premises together with the rights, privileges, license and easements necessary, incidental or in any manner appertaining to the proper prosecution of the business of quarrying and removing said limestone and other kindred substances; also the right of way for necessary pads and railroads over said premises, and the right to occupy so much of the surface of said premises as may be reasonably necessary for the [storing] of said limestone rock or other kindred substances, and depositing the refuse therefrom, and the right to erect on said premises such buildings, structures and fixtures as may be necessary or incidental to the proper prosecute of said business of quarrying.

*Id.* at 2.  Similar to the prior leases, the third lease reserved to the Clifts the "right to all timber cut by [Fredonia Valley Quarries] on the premises in the course of operation."  *Id.* at 3.

In return, the third lease guaranteed the Clifts a minimum royalty payment of $50.00 per month, excluding the months from December to April unless the quarries operated during those months.  *Id.* at 2–3.  It also provided a production royalty of 7.5¢ per ton for the first 4,000 tons of limestone, and of 4.5¢ for each ton thereafter, removed during any particular month.  *Id.* at 2.  Unlike the prior leases, the third lease further obligated Fredonia Valley Quarries "to deliver to [the Clifts] at the Quarries, fifteen

ton[s] (15) of agricultural lime each year for and during the life of [the] lease, free of any cost." *Id.* at 3.

Again, the initial term of the third lease was five years, with an option to renew:

> It is mutually agreed by the parties hereto that this lease shall run for five (5) years from and after this date and if all the stipulations, covenants and agreements herein contained have been well and truly kept and performed by the [lessee] as herein provided, this lease may be renewed according to the terms hereof and for the same consideration for five (5) additional years and at intervals of five (5) years thereafter for a period not exceeding ninety nine (99) years, and so long as said conditions have been kept and performed.

*Id.* If the lessee failed either "to operate the Quarries or to pay rent for a period of ninety (90) days," the Clifts retained the right to declare "a forfeiture of [the] lease." *Id.* Other than that, the lease did not include any provision allowing the lessee to terminate the lease prior to expiration. *See id.* at 1–5.

**2.**

From at least 1977, the Clifts have farmed the tract of land at issue, growing wheat, corn, soybeans, and alfalfa. *See* R. 83-5 at 27–28 (William Clift's Deposition Excerpt). Clifton Clift, Sr. died testate on October 16, 1988, and devised the tract of land to his two sons, William Clift and Clifton Clift, Jr. *See* R. 84-7 at 1–3 (Last Will and Testament); R. 83-5 at 10. Subsequently, in 2011, William and Judith Clift (his wife) conveyed the entire tract to Clifton, Jr., and Barbara Clift (his wife), with a reservation of an undivided one-half interest "in all of the minerals and limestone in, on or under" the tract. R. 84-8 at 1 (Deed). William Clift, II, the son of William and Judith Clift, continues to farm the portion of the tract that has not yet been mined. *See* R. 88-3 at 23 (William Clift, II's Deposition Excerpt).

**3.**

Sometime between 1977 and 1986, Fredonia Valley Quarries, Inc. merged with Basic Incorporated. *See* R. 84-9 at 11, ¶ 13 (Assignment and Assumption of Leases); R. 83-6 at 70–72 (Hastie's Deposition). Under Basic Incorporated's management, the quarry fell into a state of unprofitability and "disarray." R. 83-6 at 75–76. In exchange for $450,000, *see id.*, Basic Incorporated assigned the quarry (including the third lease) on January 28, 1986 to Rock Dust Products, *see* R. 84-9 at 11, ¶ 13, a general partnership consisting of Denny and Simpson Stone Company, Inc., Rigsby and Barnard Quarry, Inc., and Hastie Mining and Trucking Company, *see id.* at 1; R. 83-6 at 29–20.

Within the following six months, Rock Dust Products invested roughly $2,000,000 in new equipment to make operating the quarry feasible. R. 83-6 at 76. Over the next eleven years, Rock Dust Products operated the quarry with around twenty employees. *See id.* at 35–37, 75–77. During that time, Rock Dust Products reinvested any net income from the quarry back into the operation. *See id.* at 75–77.

Then, on May 5, 1997, Rock Dust Products assigned the quarry (including the third lease) to RDP Company. *See* R. 84-9 at 11, ¶ 13. The same day, RDP Company subleased the quarry to Martin Marietta Materials, Inc. *See* R. 84-10 at 17, ¶ 6 (Short Form of Lease and Sublease Agreement); *see also* R. 1-3 to -5 (Master Lease and Sublease Agreement). Under the sublease, Martin Marietta agreed to pay RDP Company a royalty of 30.33¢ per ton of limestone mined until April 30, 2007, followed by a royalty of 30.33¢ per ton, or 4.5% of Martin Marietta's weighted average retail price per ton, whichever is greater, until April 30, 2027. R. 1-3 at 10–11, § 3.2. RDP Company remained responsible for paying all rents, royalties, unmined mineral taxes, and such

other expenses related to the subleased tracts from its own royalty. *Id.* at 6, § 2.5. Martin Marietta assigned the sublease to Lafarge West, Inc., the present quarry operator, on December 9, 2011. *See* R. 84-11 at 7, ¶ 6 (Second Assignment and Assumption of Lease Agreement). Lafarge West has operated the quarry since that time.

Sometime prior to 1998, it appears as if someone mined a small portion (approximately 0.25 acres) of the Clift tract. *See* R. 84-12 at 16–18 (Fernow's Deposition Excerpt); R. 83-16 at 1–2, ¶ 1 (Gaston's Report); *see also* R. 90-1 at 4 (Survey of Rock Dust Products, Inc. Properties); R. 83-15 at 2 (Specific Purpose Survey). Ostensibly, the area was forested too. *See* R. 84-21 at 1 (Aerial Photograph). It is estimated that between 10,000 and 25,000 tons of material, a substantial portion of it limestone, was excavated from that area. *Compare* R. 84-12 at 18 (estimating less than 10,000 tons of limestone), *with* R. 83-16 at 2, ¶ 1 (estimating 25,000 tons of material with a "substantial portion" thereof being limestone). Regardless of the amount of limestone presumably mined, the Clift family was not paid any production royalties for the 0.25 acre "nick." RDP Company has no knowledge about when and how much limestone has been quarried from the Clift tract. *See* R. 84-13 at 1 (RDP Company's Response to Clifts' First Set of Interrogatories and Requests for Production of Documents).

Other than that small portion, the Clift tract remained undisturbed until sometime in or about 2012. Around that time, Lafarge West began expanding its operation onto the Clift tract. Between 2012 and 2013, Lafarge West constructed an access road on the tract. *Compare* R. 84-15 at 1 (Lafarge West's Response to Clifts' First Set of Interrogatories) (summer of 2013), *with* R. 84-20 at 33–34 (Fernow's Deposition Excerpt) (estimating summer of 2012), *and* R. 83-16 at 3, ¶ 3 (estimating, based on aerial

photography, between May 28, 2011 and November 6, 2013). Lafarge might have felled trees in the process of constructing the road, but the record is hardly clear on that point. *See* R. 84-21 at 1. In any event, the roadway was "made out of limestone that was not commercially viable," R. 84-16 at 33 (Fernow's Deposition Excerpt), *i.e.*, "waste rock in the quarry" and not from the Clift tract, R. 83-9 at 25 (Champion's Deposition Excerpt). The access road is approximately 935 feet in length, *see* R. 84-15 at 1–2, and between sixty to eighty feet in width, *compare* R. 83-9 at 24 (sixty feet), *and* R. 83-16 at 3, ¶ 3 (sixty-five feet), *with* R. 84-15 at 1–2 (eighty feet). While the road provides access to the property, it does not traverse the tract. *See* R. 83-9 at 25; R. 90-3 at 49 (Fernow's Deposition Excerpt).

Generally speaking, the access road has "has been used sporadically since its construction for inspection of the area for safety and environmental purposes, placement of seismographs to monitor the blast vibration along the gas pipeline, and for access to do stripping and other mining activities." R. 84-18 at 1 (Lafarge West's Response to Clifts' First Set of Interrogatories). Mark Champion, Lafarge West's Plant Manager, testified that the Clift road has not been used to access other properties in the area, only for operations on the Clift tract itself. *See* R. 83-9 at 24. Nathan Fernow, Lafarge West's Plant Manager from February 2014 to October 2015, *see* R. 83-19 at 1, ¶ 1 (Fernow's Declaration), said that no limestone has been hauled across the access road, and that there are no plans to do so in the future. R. 84-20 at 34; *see also* R. 86-8 at 28–29 (Fernow's Deposition Excerpt). William Clift, II, has never seen limestone being hauled across the Clift tract. *See* R. 83-17 at 9–11 (William Clift, II's Deposition Excerpt).

As part of its expansion onto the Clift tract, Lafarge sent a letter to the Clifts on January 24, 2014, informing them that it planned "to begin stripping efforts on approximately 10 acres," and requested a response within ten days of receipt in order to discuss whether the Clifts wanted the timber. R. 83-10 at 1 (Letter from Hick Winters to the Clifts). The Clift family acknowledged receipt of the letter on January 31, 2014, and expressed their opinion that RDP Company was a holdover tenant whose rights would terminate on August 1, 2014. *See* R. 83-11 at 1–2 (Letter from George E. Stigger, esq., to RDP Company). However, the letter made no statement as to the Clifts' desire for the timber. *See id.* Clifton Clift, Jr., William Clift, and William Clift, II communicated no objection to Lafarge West about removing the timber, and none are aware of anyone else doing so either. *See* R. 83-8 at 47–48 (Clifton Clift, Jr.'s Deposition Excerpt); R. 86-4 at 36–39 (Clifton Clift, Jr.'s Deposition Excerpt); R. 86-5 at 104–06 (William Clift, II's Deposition Excerpt); R. 86-3 at 34–36 (William Clift's Deposition Excerpt).

Still, Lafarge West contracted with Beavers Logging to appraise the value of the timber. *See* R. 83-13 at 52–53 (Fernow's Deposition Excerpt). According to Beaver, around half of the ten-acre area contained timber worth somewhere between $4,700 to $5,300 dollars, but harvesting it would not be "economically feasible." R. 83-12 at 3 (Beavers Logging Timber Valuation Estimate). Subsequently, sometime between March 24 and March 31, 2014, Lafarge West bulldozed the timber and prepared the ground for quarrying. *See* R. 83-13 at 50–54.

In accordance with Lafarge West's mining permit, Lafarge West also constructed a perimeter berm between the access road and a gas pipeline which traverses the Clift tract. *See* R. 83-9 at 26; R. 86-6 at 88 (Gaston's Deposition Excerpt); R. 84-17 at 1

(Lafarge West's Response to Clifts' First Set of Interrogatories). To construct the berm, Lafarge West used around 6,500 cubic yards of topsoil from the Clift tract. *See* R. 84-17 at 1; R. 83-9 at 26.

Lafarge West began mining limestone on the Clift tract in April 2015. *See* R. 84-25 at 5 (Production Royalty Check). Between April 2015 and January 2016, RDP Company has paid the Clifts around $2,575 in production royalties. *See id.* at 5–8. While the Clifts have not cashed either those checks, or any others, from RDP Company since January 2014, *see* R. 88-1 at 1, ¶ 3 (Fernow's Second Declaration), the Clifts cashed all royalty checks sent to them from as long ago as September 1977, *see* R. 83-5 at 13–14; R. 83-8 at 31–33. Prior to this litigation, William Clift never notified RDP Company or its predecessors-in-interest that the lease had not been renewed, *see* R. 88-2 at 17–18 (William Clift's Deposition), nor has William Clift, II, and he has no knowledge of anyone else doing otherwise, *see* R. 86-5 at 57.

**B.**

William Ralph Clift and Judith Bennet Clift, his wife, and Clifton Clift, Jr. and Barbara Clift, his wife, filed this action against RDP Company and Lafarge West, Inc. in Caldwell County Circuit Court on March 11, 2014. *See* R. 1-1 at 4 (Complaint). The Clifts bring claims for trespass, willful trespass, statutory waste, ejection, and declaratory judgment. *See* R. 61 at 7–13, ¶¶ 14–30 (Second Amended Complaint). Relying on this Court's diversity jurisdiction, RDP Company and Lafarge West removed the Clifts' action under 28 U.S.C. § 1441(a). *See* R. 1 at 1, ¶ 1 (Notice of Removal); *see also Clift v. RDP Company*, No. 5:14-CV-00057-TBR, 2014 WL 2218258, at *1 (W.D. Ky. May 28, 2014) (denying motion to remand).

Subsequently, RDP Company counterclaimed for declaratory judgment against the Clifts. *See* R. 4 at 8–9, ¶¶ 16–17 (Answer and Counterclaim). In addition, RDP Company and Lafarge West crossclaimed against one another, *see* R. 70 (RDP Company's Amended Crossclaim); R. 79 (Lafarge West's Amended Crossclaim), and RDP Company impleaded Martin Marietta Materials, Inc., asserting claims for common law and contractual indemnity, breach of contract, negligence, gross negligence, and willful misconduct, *see* R. 71 at 6–8, ¶¶ 26–41 (Amended Third-Party Complaint).

Now, RDP Company and Lafarge West ask the Court to grant them summary judgment against the Clifts. *See* R. 83 at 1 (RDP Company's Motion for Summary Judgment); R. 86 at 1 (Lafarge West's Motion for Summary Judgment). The Clifts make a competing claim against RDP Company and Lafarge West. *See* R. 84 at 1 (Clifts' Motion for Summary Judgment). To the extent RDP Company is successful, Martin Marietta moves for summary judgment too. *See* R. 85 at 1–2 (Martin Marietta's Motion for Summary Judgment).

## II.

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing

*Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

When the parties have filed competing motions for summary judgment, as is the case here, the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Hensley v. Grassman*, 693 F.3d 681, 686 (6th Cir. 2012) (quoting *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994)). The moving party must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of the nonmovant's claim or defense. Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Assuming the moving party satisfies its burden of production, the nonmovant "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324). With its task appropriately framed, the Court turns to the merits.

## III.

In this action, the Clifts maintain a number of claims against RDP Company and Lafarge West, Inc., such as for declaratory judgment, for trespass, and for waste. Ultimately, though, the Clifts seek a declaration that the mineral rights lease between them and RDP Company has not been renewed, has been terminated, or is unconscionable and ought to be reformed. Upon careful consideration, and for the

reasons discussed in more detail below, the Court finds the Clifts' manifold theories to be meritless. Accordingly, RDP Company and Lafarge West (as well as Martin Marietta Materials, Inc.) are entitled to judgment as a matter of law.

## A.

The Clifts claim that RDP Company and its sublessees are nothing more than holdover tenants under Ky. Rev. Stat. § 383.160. *See* R. 84-1 at 17–19 (Memorandum in Support of Clifts' Motion for Summary Judgment); R. 95 at 3 (Reply to Lafarge West's Response); R. 96 at 10–12 (Reply to RDP Company's Response). To arrive at that conclusion, the Clifts make two separate arguments. First, the Clifts say that the lease provided a right to *renew*, but not to *extend*, the lease—a right neither RDP Company nor its predecessors-in-interest exercised. *See* R. 84-1 at 9–12; R. 95 at 4–7; R. 96 at 2–7. Second, the Clifts submit, even if RDP Company and its predecessors-in-interest had an option to extend the lease, neither satisfied the conditions precedent to exercising that right. *See* R. 84-1 at 14–17; R. 95 at 8–10; R. 96 at 7–10. The Court disagrees on both scores.

## 1.

Kentucky law has long recognized two kinds of rights allowing a lessee to prolong a tenancy. The first is a "right of renewal," which "connotes that a new, formal agreement in writing [will] be executed by the parties . . . or, at the least, [that] some positive act other than a mere holding over beyond the fixed term [will] be taken." *Lexington Flying Serv. v. Anderson's Ex'r*, 239 S.W.2d 945, 946 (Ky. 1951). The second is a "right of extension," which generally requires only that the lessee hold over in order to exercise the "option or privilege 'to extend.'" *Klein v. Auto Parcel Delivery Co.*, 234

S.W. 213, 214 (Ky. 1921).  To determine which type of right that a lease contemplates, courts look to "[1] the language the lease uses to describe the right, [2] the intent of the parties as manifested by other terms in the lease, and [3] the parties' conduct before the controversy arose."  *1651 N. Collins Corp. v. Lab. Corp. of Am.*, 529 F. App'x 628, 633 (6th Cir. 2013) (citing *Klein*, 234 S.W. at 215).

Here, the Clifts say, RDP Company has nothing more than a right to renew the lease.  *See* R. 84-1 at 9–12; R. 95 at 4–7; R. 96 at 2–7.  Respectfully, the Court disagrees.  Though the lease uses the term "renew," it contemplates a right to extend the lease term by "well and truly" keeping and performing "all [of] the stipulations, covenants and agreements" in the lease.  R. 84-4 at 3.

As the Clifts point out, the lease uses the term "to be 'renewed,'" as opposed to "'extend' or [to be] 'extended.'"  R. 84-1 at 9; *see also* R. 84-4 at 3.  True enough, the use of the word "renew" has at least *some* significance.  *See 1651 N. Collins Corp.*, 529 F. App'x at 633 ("The language of the original lease agreement . . . provides for an 'option to renew,' suggesting the parties believed at the time of the original lease that separate agreements to prolong the lease would be needed.").  However, the inclusion of that term is often not, standing alone, dispositive.  *See Klein*, 234 S.W. at 215 ("[T]he privilege may thus be construed as one to 'extend' the term, although the language employed is one 'to renew' it."); *Kozy Theater Co. v. Love*, 231 S.W. 249, 251 (Ky. 1921) (same); *1651 N. Collins Corp.*, 529 F. App'x at 633 (same).  Instead, the word "'renew' will not be given its strict legal interpretation, unless it is evident from some provision of the lease, or from the conduct of the parties [before the controversy arose,]

that the word was not used as a synonym for the word 'extend.'" *Lexington Flying Serv.*, 239 S.W.2d at 947.

Here, the relevant terms of the lease suggest that RDP Company (and its predecessors-in-interest) hold an option to extend. For example, the lease provides that RDP Company's option is on the same "terms and for the same consideration" as the original lease. R. 84-4 at 3. No material term is left open, in which case a new signed writing capturing all material terms (*e.g.*, a renewal) would be required. *Cf. Camelot LLC v. AMC ShowPlace Theatres, Inc.*, 665 F.3d 1008, 1010 (8th Cir. 2012) ("If terms have deliberately been left open, the parties have an option to renew and the terms must be renegotiated for a binding contract to exist." (citing *King v. Dalton Motors, Inc.*, 109 N.W.2d 51, 52–53 (Minn. 1961))).

While the Clifts maintain that, by conditioning the option to prolong the lease on the lessee's performance of "all [of its] stipulations, covenants and agreements," the parties intended to confer a right of renewal, R. 84-1 at 10 (quoting R. 84-4 at 3), the Court is not so sure. The presence of a condition precedent to the exercise of an option to prolong a lease does not, in of itself, mean that the corresponding right must be of renewal. Instead, "if the lease prescribes a condition precedent to the exercise of the privilege by the lessee, . . . *whether the privilege be one 'to renew' or 'to extend' the original term* . . . such condition must be complied with, or it must be waived by the lessor"—nothing more, nothing less. *Klein*, 234 S.W. at 215 (emphasis added). There is nothing anomalous about conditioning an option to extend on the satisfaction of some term or the performance of some particular act. *See Edwards-Pickering Co. v. Rodes*, 261 S.W. 884, 886–87 (Ky. 1924).

Lastly, the parties' conduct contemplates an option to extend the lease. From 1982 through 2012, the parties never signed any document purporting to prolong the 1977 lease, and the Clifts didn't ask to either. *See* R. 88-2 at 17–18; R. 86-5 at 57. Instead, the Clifts cashed each royalty check sent to them for over thirty-five years. *See* R. 83-5 at 13–14; R. 83-8 at 31–33. Throughout that time period, the parties treated the 1977 lease as a binding agreement.

The Clifts claim that the parties' conduct reveals that a separate, formal lease agreement is necessary to prolong the lease term. *See* R. 84-1 at 10–11. To arrive at that conclusion, the Clifts characterize the 1977 lease as a written renewal of the 1972 lease, and the 1972 lease as a written renewal of the 1967 lease. *See id.* at 3, 10–11. Since the parties required written renewals then, the Clifts say, the parties must have meant to prolong the lease term only if a written renewal was executed. *See id.* at 11.

The "prior execution of a signed agreement to renew a lease," it is true, tends to show that "a covenant to renew . . . required a writing." *1651 N. Collins Corp.*, 529 F. App'x at 634 (quoting *Tinaco Plaza, LLC v. Freebob's, Inc.*, 814 A.2d 403, 410 (Conn. App. Ct. 2003), *cert. granted*, 819 A.2d 840 (Conn. 2003), *and cert. dismissed*, No. 16970 (Conn. Feb. 4, 2004)). The 1977 lease is not, however, a "written renewal" of the 1972 lease. While the 1972 lease contained an option to "renew" on the same "terms and for the same consideration" as the original lease, R. 84-3 at 3, the 1977 lease differed from the 1972 lease in almost every material respect: The 1977 lease completely altered the formula for calculating production royalties, omitted a minimum acreage royalty, added a right to fifteen tons agricultural lime annually, and set 2076 as outer mark for prolonging the lease term. *Compare* R. 84-4 at 1–5, *with* R. 84-3 at 1–4; *see also* R. 88 at

7–8 (RDP Company's Response). Properly described, the 1977 lease is a separate and independent agreement. *See Ala. Farmers Co-op., Inc. v. Jordan*, 440 F. App'x 463, 467 (6th Cir. 2011) ("The 2000–2005 lease—not signed until sometime in 2001—could not reasonably be deemed a 'renewal' of the 1995–2000 lease because the second lease contained different terms—namely, an increase in the price of purchase option . . . ."). Since the 1977 lease stands apart from the 1972 lease, the parties' conduct as to *that* lease is most probative of what the parties intended.

To summarize, though the lease uses the term "renew," the parties' intent as manifested in other terms of the lease and the parties' conduct before the controversy arose point to a right to "extend" instead. In other words, RDP Company need not "renew" the lease in writing. Instead, the lease contemplates a right to extend the lease term by "well and truly" keeping and performing "all [of] the stipulations, covenants and agreements" in the lease. R. 84-4 at 3.

**2.**

Even if RDP Company had an option to extend the lease, though, the Clifts argue that RDP Company failed to satisfy the conditions precedent to exercising that right. *See* R. 84-1 at 14–17; R. 95 at 8–10; R. 96 at 7–10. Said differently, the Clifts maintain that RDP Company has not "well and truly kept and performed . . . all the stipulations, covenants and agreements" in the lease. R. 84-4 at 3. While the Clifts point to four alleged defaults in support of that proposition, none show promise.

**a.**

The Clifts argue that RDP Company defaulted under the lease because it failed to pay production royalties on a small portion of the Clift tract ostensibly mined sometime

17

before 1998. *See* R. 84-1 at 14–15; R. 90 at 17–18 (Response to RDP Company); R. 95 at 8–9; R. 96 at 7–8. The Clifts concede that any claim "for breach of contract for failure to pay the production royalty is time-barred." R. 95 at 9; *see also* R. 96 at 8 n.5. But the failure to pay that production royalty, the Clifts say, "remains a breach of the stipulations, covenants and agreements" such that it prevented renewal of the lease. R. 95 at 9. The Court is not so sure.

In the main, the Clifts have waived any right to work a forfeiture of the lease, or to contest any subsequent renewal of the lease, based upon the alleged nonpayment of the production royalty. Under Kentucky law, "waiver" is defined as "an intentional relinquishment of a known right." *Bates v. Grain Dealers Nat'l Mut. Fire Ins. Co.*, 283 S.W.2d 3, 5 (Ky. 1955). It may be express, or it may be implied from the conduct of a party. *Id.* The question of whether certain conduct amounts to "a waiver is a question of law" for the Court to decide. *Eaton v. Trautwein*, 155 S.W.2d 474, 478 (Ky. 1941) (citing *Vroman v. Darrow*, 40 Ill. 171, 173 (1866)). "The general rule is that when rent is accepted by a lessor with knowledge of particular conduct which is claimed to be a default on the part of the lessee, acceptance of the rent constitutes a waiver by the lessor of the lessee's default." *First Nat'l Bank & Tr. Co. v. Marietta Materials, Inc.*, 22 F. App'x 546, 549 (6th Cir. 2001) (citing 49 Am. Jur. 2d *Landlord and Tenant* §§ 87, 330 (1995); 3 Am. Jur. Proof of Facts 2d §§ 1–2 (1974)); *accord Bridges v. Jeffrey*, 437 S.W.2d 732, 733 (Ky. 1968); *Venters v. Reynolds*, 354 S.W.2d 521, 524 (Ky. 1961); *Stamper v. Ford's Adm'x*, 260 S.W.2d 942, 943 (Ky. 1953); *Kelley v. Ivyton Oil & Gas Co.*, 265 S.W. 309, 310 (Ky. 1924); *Rich v. Rose*, 99 S.W. 953, 955 (Ky. 1907).

Constructive knowledge of the conduct is sufficient. *Batson v. Clark*, 980 S.W.2d 566, 576 (Ky. Ct. App. 1998).

Here, RDP Company ostensibly mined a small portion of the Clift tract sometime prior to November 1998. It paid no production royalties on the limestone quarried, if any, from that tract. Since the Clift family has been farming the land since at least 1977, the Clifts certainly knew that portion of the tract had been mined. However, the Clifts cashed each and every royalty payment RDP Company sent to them through January 2014. Until filing the instant action, the Clifts neither demanded that RDP Company pay the production royalty, nor notified RDP Company that the Clifts considered the lease inoperative. "Under Kentucky law, by accepting these payments with knowledge of the alleged breach, the [Clifts] waived their right to terminate" the lease for the breach. *First Nat'l Bank & Tr. Co.*, 22 F. App'x at 550.

In the alternative, and as the Clifts concede, any claim "for breach of contract for failure to pay the production royalty is time-barred." R. 95 at 9. Ky. Rev. Stat. § 413.090(2) provides that all actions upon a written contract "shall be commenced within fifteen (15) years after the cause of action first accrued." In this case, a breach of contract claim would have accrued the month after the Clift tract was quarried. The disturbance occurred in November 1998. The Clifts initiated the instant action on March 11, 2014. Accordingly, any claim for forfeiture or termination of the lease based upon the disturbance is barred by the statute of limitations.

**b.**

Next, though the Clifts say that RDP Company has not delivered the fifteen tons of agricultural lime as provided for in the lease, *see* R. 84-1 at 17, that argument is of no

moment. The lease obligates RDP Company to deliver fifteen tons of agricultural lime per year "at the Quarries." R. 84-4 at 3. It is undisputed that Lafarge West opened an account and set-aside that agricultural lime each year. *See* R. 83-13 at 56–57. Yet, no one from the Clift family ever travelled to the quarry and claimed the agricultural lime. *See* R. 84-23 at 54–55 (William Clift, II's Deposition); R. 86-5 at 106. Contrary to the Clifts' suggestion, *see* R. 84-1 at 17 & n.6, the lease does not obligate RDP Company to notify them when the agricultural lime is available. Instead, it grants the Clifts a right to retrieve the agricultural lime upon demand. Having never made such a demand, *see* R. 86-5 at 106, there is no breach.

### c.

Moreover, the Clifts maintain that RDP Company has not kept its "implied covenant to quarry and remove the limestone and related substances within a reasonable time." R. 84-1 at 16. As RDP Company is quick to point out, though, the Clifts' second amended complaint makes no mention of any breach of an implied obligation to diligently mine the Clift tract. *See* R. 88 at 11–12. The Court agrees: Such a claim is not properly before the Court

An evaluation of the scope of a party's claim at the summary judgment stage "amounts to a decision of the sufficiency of a pleading, which is a question of law" for the Court to decide. *Carter v. Ford Motor Co.*, 561 F.3d 562, 565 (6th Cir. 2009) (citing *Minadeo v. ICI Paints*, 398 F.3d 751, 756 (6th Cir. 2005)). The key issue in a challenge to the sufficiency of a pleading is notice. *Id.* at 565–66; *see also Kurtz v. McHugh*, 423 F. App'x 572, 579 (6th Cir. 2011). The Federal Rules of Civil Procedure provide "for liberal notice pleading at the outset of the litigation because '[t]he provisions for

discovery are so flexible' that by the time a case is ready for summary judgment, 'the gravamen of the dispute [has been] brought frankly into the open for inspection by the court.'" *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (alterations in original) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512–13 (2002)). But the "nature of the notice requirement is much more demanding at the summary judgment stage than at earlier stages of the litigation, because by this point a plaintiff has had the opportunity to conduct discovery and to amend the complaint to reflect new theories." *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 665 (6th Cir. 2012) (citing *Tucker*, 407 F.3d at 787–88). With limited exception, then, a party may not raise new claims or assert new legal theories during the summary judgment stage. *See Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) (citing *Harvey v. Great Seneca Fin. Corp.*, 453 F.3d 324, 329 (6th Cir. 2006); *Tucker*, 407 F.3d at 788; *Mich. Bell Tel. Co. v. Strand*, 305 F.3d 580, 589–90 (6th Cir. 2002)).

Here, the Clifts attempt to do just that, and it is hard to say that RDP Company had sufficient notice. The Clifts' second amended complaint makes no reference to an implied obligation of diligent mining. *See* R. 61 at 6–13, ¶¶ 12–30, and "contains little in the way of 'supporting facts'" that might have provided RDP Company with some warning, *Carter*, 561 F.3d at 566. Despite ample opportunity, *see* R. 19 at 1 (Order of November 14, 2014); R. 59 at 1 (Order of August 7, 2015), the Clifts never added an allegation of that ilk to their pleadings. With this litigation now in the eleventh hour, the Clifts cannot expand their claims to include that new legal theory. *Cf. Henderson v.*

*Chrysler Grp., LLC*, 610 F. App'x 488, 494 (6th Cir. 2015); *Renner v. Ford Motor Co.*, 516 F. App'x 498, 504 (6th Cir. 2013); *Desparois*, 455 F. App'x at 666.

Even if the Clifts could, though, the theory goes nowhere on the merits. In Kentucky, a mineral lessee may forfeit its interest by breaching an express or implied obligation, *see Wheeler & Lemaster Oil & Gas Co. v. Henley*, 398 S.W.2d 475, 476 (Ky. 1965), including an implied obligation to develop the mineral leasehold, *see Cawood v. Hall Land & Mining Co.*, 168 S.W.2d 366, 369 (Ky. 1943). Where the lease provides the lessor with minimum advance royalties, the implied obligation comes into play only after (1) the lessor gives notice and demand to commence (or increase) development, and (2) declines to accept subsequent advance royalty payments. *See Cameron v. Lebow*, 338 S.W.2d 399, 403 (Ky. 1960), *overruled on other grounds as recognized in Carrs Fork Corp. v. Kodak Mining Co.*, 809 S.W.2d 699, 702 (Ky. 1991); *Warren Oil & Gas Co. v. Gilliam*, 207 S.W. 698, 699 (Ky. 1919); *Monarch Oil, Gas & Coal Co. v. Richardson*, 99 S.W. 668, 669 (Ky. 1907); *Hiroc Programs, Inc. v. Robertson*, 40 S.W.3d 373, 377 (Ky. Ct. App. 2000); *accord Johns Hopkins Hosp. v. Peabody Coal Co.*, 920 F. Supp. 738, 749–50 (W.D. Ky. 1996); *cf.* Nancy Saint-Paul, 3 *Summers Oil and Gas* § 22:22 (3d ed.), Westlaw (database updated Nov. 2015).

Both before and after filing this action, the Clifts never told RDP Company to develop and mine the tract. *See Carrs Fork Corp.*, 809 S.W.2d at 702 ("The filing of a lawsuit is not proper notice when a lessor seeks forfeiture on due diligence grounds." (citing *B & B Oil Co. v. Lane*, 249 S.W.2d 705 (Ky. 1952))). Likewise, the Clifts accepted all royalty payments sent to them through January 2014. Accordingly, RDP Company did not breach any implied obligation to develop the mineral leasehold.

**d.**

Lastly, the Clifts argue that RDP Company breached the lease when, without notice to the Clifts, it ostensibly felled timber in 2012 to construct the access road and to mine a portion of the tract sometime prior to 1998. *See* R. 84-1 at 16–17; R. 90 at 18; R. 95 at 9–10. RDP Company points out, however, that the Clifts' allegations sorely lack evidentiary support. *See* R. 92 at 3 (RDP Company's Reply). Indeed, it seems as though the Clifts' only proof consists of a few aerial photographs ostensibly showing the areas were forested years earlier. These facts do not give rise to an inference of default under the lease.[1]

**3.**

In summary, RDP Company has not defaulted under the terms of the lease between it and the Clifts. RDP Company has extended the term of the lease by "well and truly kep[ing] and perform[ing] . . . all the stipulations, covenants and agreements" contained therein. R. 84-4 at 3. It may extend the lease through July 31, 2076, should it continue to do the same.

**B.**

In the alternative, the Clifts maintain that the third lease has become unconscionable over time because the royalty paid to them has remained constant, even though the price of limestone in the area has ostensibly risen since 1977. *See* R. 84-1 at 19–24; R. 95 at 10–13; R. 96 at 12–15. Though only "used in rare instances, such as when a party abuses its right to contract freely," *Forsythe v. BancBoston Mortg. Corp.*,

---

[1] For the same reason, the Clifts' statutory waste claim, *see* R. 84-1 at 16–17 (Memorandum in Support of the Clifts' Motion for Summary Judgment); R. 89 at 9–11 (Response to Lafarge West); R. 90 at 13 (Response to RDP Company); R. 96 at 9–10 (Reply to Lafarge West), also fails.

135 F.3d 1069, 1074 (6th Cir. 1997) (citing *Louisville Bear Safety Serv., Inc. v. S. Cent. Bell Tel. Co.*, 571 S.W.2d 438, 439 (Ky. Ct. App. 1978)), the doctrine of unconscionability is "one of the grounds upon which any contract may be revoked," *Energy Home, Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 835 (Ky. 2013) (citing *AT & T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1747 (2011); *Schnuerle v. Insight Commc'ns Co.*, 376 S.W.3d 561, 575 (Ky. 2012); *Conseco Fin. Servicing Corp. v. Wilder*, 47 S.W.3d 335, 341 (Ky. Ct. App. 2001)).  "An unconscionable contract is 'one which no man in his sense, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other.'"  *Schnuerle*, 376 S.W.3d at 575 (quoting *Louisville Bear Safety Serv., Inc.*, 571 S.W.2d at 440).

Unconscionability comes in two flavors: procedural and substantive.  *Energy Home*, 406 S.W.3d at 835; *accord In re Merv Properties, L.L.C.*, 539 B.R. 516, 531 (B.A.P. 6th Cir. 2015).  "Procedural unconscionability relates to the process by which an agreement is reached and to the form of the agreement."  *Energy Home*, 406 S.W.3d at 835 (citing *Schnuerle*, 376 S.W.3d at 576–77).  It includes, for example, "the use of fine or inconspicuous print and convoluted or unclear language that may conceal or obscure a contractual term."  *Id.* (citing *Schnuerle*, 376 S.W.3d at 576–77).  When evaluating whether a contract is procedurally unconscionable, the Court ought to consider factors such as "the bargaining power of the parties, 'the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice.'"  *Schnuerle*, 376 S.W.3d at 576 (quoting *Jenkins v. First Am. Cash Advance of Ga., LLC*, 400 F.3d 868, 875–76 (11th Cir. 2005)).  "Substantive unconscionability refers to contractual terms that are unreasonably or grossly favorable to

one side and to which the disfavored party does not assent." *Energy Home*, 406 S.W.3d at 835 (citing *Schnuerle*, 376 S.W.3d at 577). Factors relevant to the substantive unconscionability inquiry include "the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." *Id.* (quoting *Schnuerle*, 376 S.W.3d at 577).

Here, the Clifts take the position that the Kentucky Supreme Court would endorse the view that a contract may become unconscionable over time based upon changed circumstances. *See* R. 84-1 at 19–24; R. 95 at 10–13; R. 96 at 12–15. They urge the Court to follow the Kentucky Court of Appeals' holding to that effect in *Kentucky West Virginia Gas Co. v. Interstate Natural Gas Co.*, Nos. 1998-CA-001460-MR, 1998-CA-001953-MR, 1998-CA-002036-MR, 1998-CA-002037-MR, 1998-CA-002038-MR, 1998-CA-003186-MR, 1999-CA-000186-MR (Ky. Ct. App. June 9, 2000) (unpublished), *as modified on denial of reh'g* (Ky. Ct. App. Aug. 25, 2000), *discretionary review denied*, Nos. 2000-SC-000847-D, 2000-SC-000862-D (Ky. Aug. 15, 2001), as that decision "removes any doubt" as to how Kentucky would resolve the issue, R. 95 at 12. The Court rejects that argument.

Because the Court's jurisdiction over this case rests on the diversity of the parties, *see* 28 U.S.C. § 1332, this Court applies Kentucky law as enunciated by the Kentucky Supreme Court, *see Tooling, Mfg. & Techs. Ass'n v. Hartford Fire Ins. Co.*, 693 F.3d 665, 670 (6th Cir. 2012). Absent a controlling decision on the relevant issue, the Court must try to predict how the Kentucky Supreme Court would resolve the question. *See Heil Co. v. Evanston Ins. Co.*, 690 F.3d 722, 731 (6th Cir. 2012). In doing so, the Court looks to "the decisions (or dicta) of the Kentucky Supreme Court in analogous cases,

pronouncements from other Kentucky courts, restatements of law, commentaries, and decisions from other jurisdictions." *State Auto Prop. & Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 195 (6th Cir. 2015) (citing *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004); *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995); *Bailey v. V & O Press Co.*, 770 F.2d 601, 604 (6th Cir. 1985)). The Court should follow the opinions—published or not—of the Kentucky Court of Appeals unless persuaded that the Kentucky Supreme Court would decide the issue otherwise. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 517 (6th Cir. 2001).

The Court predicts that Kentucky Supreme Court would not endorse the view that a contract may become unconscionable over time based upon changed circumstances. Under the general and long-standing rule, "the unconscionability of a contract or term is considered in light of circumstances 'at the time the contract is made.'" *Neely v. Consol Inc.*, 25 F. App'x 394, 401 (6th Cir. 2002) (quoting Restatement (Second) of Contracts § 208 (1979)). The rationale behind measuring unconscionability at the time of contract formation is sound:

> [V]irtually all contracts involve the assessment of risks. How fast, if at all, will land values rise over the next ten years? Are interest rates likely to increase, decrease, or remain constant? Is a particular venture likely to be a wild success or an abysmal failure? What is the probability of a debtor[] not repaying his debt? What collateral is necessary as security to protect against the debtor's possible failure to repay? Assessment of such risks is intrinsic to the process of contracting and affects the terms on which contracts are entered into.
>
> To judge the substantive fairness of contracts at a date subsequent to their making could nullify many contracts entailing a speculative element. Option to purchase agreements, for instance, might prove particularly difficult to enforce. Contingency fee contracts would be suspect if the part contracting for the free achieved unexpectedly beneficial results. Home mortgages executed at low interest rates prevent in the late 1950's might, in the light of hindsight, today be considered unconscionable in substantive terms.

*Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1043 (Utah 1985). A number of jurisdictions subscribe to the traditional view. *See, e.g.*, *Kenyon Ltd. P'ship v. 1372 Kenyon St. Nw. Tenants' Ass'n*, 979 A.2d 1176, 1186 (D.C. 2009) ("Whether a contract term is unconscionable is determined as of the time the contract is made."); *Stern v. Cingular Wireless Corp.*, 453 F. Supp. 2d 1138, 1144 (C.D. Cal. 2006) ("Under California law, '[t]he critical juncture for determining whether a contract is unconscionable is the moment when it is entered into by the parties—not whether it is unconscionable in light of subsequent events.'" (alteration in original) (quoting *Am. Software, Inc. v. Ali*, 54 Cal. Rptr. 2d 477, 480 (Cal. Ct. App. 1996))); *Best v. U.S. Nat'l Bank of Ore.*, 739 P.2d 554, 556 (Ore. 1987) ("Unconscionability is a legal issue that must be assessed as of the time of contract formation." (citing *W. L. May Co. v. Philco-Ford Corp.*, 543 P.2d 283, 286 (Ore. 1975))); *Bos. Helicopter Charter, Inc. v. Agusta Aviation Corp.*, 767 F. Supp. 363, 375 (D. Mass. 1991) ("The relevant consideration is the circumstances at the time the contract was made, and not the circumstances as they later developed." (citing *Zapatha v. Dairy Mart, Inc.*, 408 N.E.2d 1370, 1375 (Mass. 1980))). In light of those authorities, the Court does not find *Kentucky West Virginia Gas Co.* to be persuasive.

Even if the Kentucky Supreme Court recognized that a contract may become unconscionable over time based upon changed circumstances, though, there is no reason to say that the third lease is unconscionable now. In the main, the Clifts point to nothing demonstrating that the lease has become commercially unreasonable. For example, the Clifts have not introduced any proof as to the "current market rates being paid to similarly-situated landowners," or "how the rate paid to the Clifts is 'unconscionably' out

of line with those rates." R. 88 at 22. Instead, the Clifts rely solely on the fact that RDP Company receives a royalty of 30.33¢ per ton of limestone mined until April 30, 2007, followed by a royalty of 30.33¢ per ton, or 4.5% of Martin Marietta's weighted average retail price per ton, whichever is greater, until April 30, 2027. *See* R. 1-3 at 10–11, § 3.2. Yet, the Clifts ignore the fact that RDP Company's royalty represents the purchase price not simply of raw limestone, but of a quarrying business—one into which RDP Company invested millions of dollars for more than a decade. *See* R. 88 at 22–25. Without any proper comparators, there is simply no factual basis for the Clifts' unconscionability claim.

## C.

Next, the Clifts allege that RDP Company and its successors-in-interest have exceeded their rights under the lease by using the Clifts' property in conjunction with quarrying operations on adjacent lands. *See* R. 89 at 12–13; R. 90 at 7–12. In detail, the Clifts claim that Lafarge West has stored topsoil removed elsewhere on, and transported limestone quarried elsewhere over, their land. *See* R. 89 at 12–13; R. 90 at 7–12. Such conduct, the Clifts submit, constitutes a trespass. *See* R. 89 at 12–13; R. 90 at 7–12.

The Clifts' allegations, however, lack evidentiary support. First, there is no evidence of Lafarge West "storing" topsoil on the Clifts' property. Instead, the record reflects that Lafarge West constructed a perimeter berm between the access road and a gas pipeline in accordance with its mining permit. *See* R. 83-9 at 26; R. 86-6 at 88; R. 84-14 at 1. The construction of such a berm is "necessary or incidental to the proper prosecution of [the] business of quarrying," R. 84-4 at 2, as contemplated and allowed under the lease.

Second, Lafarge West has not used the access road on the Clift tract as a "haul road" for moving limestone or other kindred substances mined from other tracts. For example, Mark Champion testified that the Clift road has not been used to access other properties in the area, only for operations on the Clift tract itself. *See* R. 83-9 at 24. Nathan Fernow said that no limestone has been hauled across the access road, and that there are no plans to do so in the future. *See* R. 84-20 at 34; R. 86-8 at 28–29. William Clift, II, has never seen limestone being hauled across the Clift tract either. *See* R. 83-17 at 9–11. Because the Clifts' trespass claims lack factual support, summary judgment in favor of RDP Company and Lafarge West is appropriate.

## D.

Lastly, the Clifts claim that RDP Company and its successors-in-interest committed waste by using more surface than reasonably necessary for the quarrying operation. *See* R. 89 at 11–12; R. 90 at 13–14. "Waste" is any act "done by a tenant without license or authority from his landlord, whereby a lasting damage is done to the freehold." *Calvert v. Rice*, 12 Ky. L. Rptr. 252, 254 (1890) (quoting *Loudon v. Warfield*, 28 Ky. 196, 196 (1830)). Under Kentucky's codification of the ancient common-law doctrine of waste,

> If any tenant for life or years commits waste during his estate or term, of anything belonging to the tenement so held, without special written permission to do so, he shall be subject to an action of waste, shall lose the thing wasted, and pay treble the amount at which the waste is assessed.

Ky. Rev. Stat. § 381.350; *see also Salyer's Guardian v. Keeton*, 283 S.W. 1015, 1018 (Ky. 1926) (recounting history of common-law and statutory waste).

Even assuming that unnecessary use of surface area might constitute "waste," *see Helm Bros. v. Trauger*, 389 N.W.2d 600, 602 (N.D. 1986), the Clifts cannot show that

RDP Company or its successors-in-interest stand guilty of it. The only allegation supporting the Clifts' statutory waste claim is that the access road is too wide. *See* R. 89 at 11–12; R. 90 at 13–14. The access road is approximately sixty to eighty feet in width. *Compare* R. 83-9 at 24 (sixty feet), *and* R. 83-16 at 3, ¶ 3 (sixty-five feet), *with* R. 84-15 at 1–2 (eighty feet). Under Mine and Safety Health Administration guidelines, each lane of travel on such a road must "provide clearance, on both sides, equal to one-half the width of the widest vehicle in use," with "an additional margin for error" around curves. U.S. Department of Labor, Mine Safety and Health Administration, Handbook Number PH 99-I-4, *MSHA Handbook Series: Haul Road Inspection Handbook* 20–21 (June 1999). The widest vehicle at the quarry is the CAT 775, which is roughly eighteen feet wide. *See* R. 83-19 at 1, ¶ 3. For the access road to remain MSHA compliant, then, it ought to measure at least sixty-three feet wide, *plus* an additional margin for error around curves. Consequently, even if the access road measures eighty feet in width, Lafarge West has not used more surface area than is *reasonably* necessary.

## IV.

The Clifts' Motion for Summary Judgment, R. 84, is **DENIED**. RDP Company's Motion for Summary Judgment, R. 83, Martin Marietta Materials, Inc.'s Motion for Summary Judgment, R. 85, and Lafarge West, Inc.'s Motion for Summary Judgment, R. 86, are **GRANTED**.

An appropriate order shall issue separate from this Memorandum Opinion.

Date:

cc: Counsel of Record